That leads us to the final case on the argument calendar. That's Jones v. Bell. Thank you so much. Okay. So, Mr. Clem, you may proceed. You have reserved three minutes for rebuttal, so that gives you seven to begin. You may proceed. Good morning, Your Honors. Edwin Cornell offered the key testimony on the key issue in this case, yet the prosecution withheld, intentionally withheld, extensive evidence of his criminality as well as his reason for testifying, and the court separately permitted Mr. Cornell not to answer questions that went to his bias and motivation for testifying. Those errors separately warranted habeas relief. Well, you say it was the crucial testimony, but he, on cross, basically conceded he didn't remember who said basically the shooting. So, I mean, it seemed to me that he was already rebutted on cross on the key piece of evidence that you said was fatal to your client. He came back repeatedly on redirect, on re-redirect, and insisted countless times that he was absolutely certain that it was Mr. Jones who said it. The state was the ones who, at sentencing and on appeal, used it. And, frankly, in their opening brief to this court, twice they talk in their preliminary remark, in their preliminary paragraph, about Mr. Cornell's testimony. They still rely on his testimony. So, one of the things that I had a question about was that there was inconsistent identification of the speaker during the grand jury persuadings. So, why isn't that more persuasive than evidence of Mr. Cornell's, you know, other criminal acts? Or the information that you're saying was misheld? I'm not sure what the standard is. One has to be more persuasive than the other. It's, of course, a materiality standard under Brady as to whether the withholding of this evidence could have affected or probably affected the verdict in this case. Well, right. And so I guess, so can you explain why, in the face of that other inconsistent evidence, why it would have impacted? There's two answers. I mean, there was also the video footage showing the client following the victim, hitting and holding him, chasing around, at the very least saying, hit him. Between that and the fact that Mr. Cornell was pretty inconsistent, like, how do we know that the outcome would have been different had this material been revealed? A slight correction to the recitation. It was not clear who said hit him in that, in the trial evidence in the case. Right. The store clerk testified that. That someone said hit him. I don't believe he was clear as to who said hit him. Regardless, hit him and pop him are significantly different. And part of what matters about Cornell's testimony is not even necessarily who said pop him, but that pop him itself was said. And pop him was said right before the fatal shot, because that, of course, goes to the acting in concert and whether or not Mr. Jones or others shared the intent to either cause the death or seriously physically injure Mr. Guero here. So the very fact that it was said relies entirely on Cornell's testimony. And his inconsistency in one of the two grand jury presentations over that, which he then tried to explain, was not sufficient impeachment. I have to say, it seemed to me that if the jury had credited that statement, then your client likely would have been convicted of the murder count, wouldn't he? If he had directed his co-conspirator to shoot the decedent, wouldn't that be enough for the murder count? It's not a sufficiency analysis, but obviously it would be enough for the murder count. But here we have a jury verdict, which could well have been a compromise with some jurors believing it, some jurors not. What seems striking is to say that the evidence of Mr. Jones's intent to come dangerously close to wanting to kill him was somehow overwhelmingly established when the jury found unanimously that Mr. Jones did not have the intent to kill Peguero. Counsel, would you just address the fact that we're not here on a 2255 federal conviction, we're here on a 2254. There's an additional layer of deference. So not only do you need to show reasonable probability of a different verdict for the prejudice prong in Strickland, or of Brady rather, but the materiality rather. But you also have to show that the state court's application of the Brady materiality standard was objectively unreasonable. So you have to show you agree more than just that we would have come out the other way on the materiality conclusion, right? We'd have to show, you have to show that the state court was objectively unreasonable. So there has to be sort of an additional modicum of error on the part of the state court, right? So could you just address that additional burden that you have? That's, of course, correct. That is the standard that we're operating upon here. Here, the state court's decision to the extent that it found the evidence overwhelming so as to excuse this Brady violation and the confrontation clause violation was objectively unreasonable. It was also objectively unreasonable to find that the suppressed evidence was of the same type of the evidence that was disclosed. The prosecution disclosed no criminal convictions here. They disclosed a disorderly conduct, a marijuana conviction, a reckless driving, arrest. The only significant disclosure the state made here was of the pending gun charge that pales in comparison to what they purposely suppressed here, which was scores of gunpoint robberies, which were violent gunpoint assaults. And perhaps most significantly, by withholding all that, they also withheld from the defense the fact that Mr. Cornell was getting significant additional benefits by his testimony, which was that the state was not going to prosecute him for any of that conduct, including that violent pistol whipping of Monzo. And my friend says we have no evidence that the state had enough. I'd point the court to the prosecution's testimony at Cornell's hearing where the prosecutor testified that she was well aware of that assault. And, in fact, the search warrant was based on that assault. And that's at page A810 and A813 of the appendix. There are similar issues here with the confrontation clause. Yeah, I'm hoping you can spend some time on the confrontation clause because I'm more troubled there. Can you explain to me why your arguing to the jury about what they could infer wasn't enough? Can you? Sure. I mean, the jury is, of course, entitled to see the witness answer the questions. And that's what the confrontation clause violation is here. It's not good enough that the jury was given some information about what the state said the deal was. What matters is Cornell's— Well, the big question, though, is that sufficient—is the inference that you asked for sufficient to establish that Cornell had an incentive to lie? Right? Because that's what you're hoping that the jury would have inferred. So why wasn't your statement about it sufficient? Well, I think what we were hoping to have happen is that Cornell would answer the questions about what his incentives were and that he would honestly answer those and that his incentives were massive, that he was getting out of all kinds of criminal prosecutions by this cooperation agreement. And it wasn't merely that the state was going to let the court know of his cooperation in the one gun charge, but that the state had made a decision or that Cornell perceived the state had made a decision not to prosecute him for all that conduct. He was beholden to the state in his testimony and needed to provide evidence against Mr. Jones that would please the state here. Okay. So can you let me—again, I think this is the harder question. Can you suggest any case or precedent that would say that a defendant must be able to examine, cross-examine a cooperating witness about his understanding of his own cooperating—of his own cooperating agreement? Sure. I mean, I think Van Arsdale in general, of course, speaks to that, on the general question, that bias is never going to be collateral and that we're entitled to hear it from the witnesses. And the Hoover case from the Fourth Circuit that's cited in my brief talks specifically about it. It's the witness's understanding of the deal that they're going to receive that's critical. And that's even more important in this case. Recall that this is the same stipulation where the prosecutor is misrepresenting to the court that they're disclosing everything about Cornell's criminality to the court when we know that was, in fact, not true. That they're now asking this court to rely on as a substitute for the deprivation of Mr. Jones's Confrontation Clause rights. That was not subject to any sort of testing in court. It was an alternate remedy that was afforded that doesn't protect us or shouldn't give us any confidence that that was the full scope of the understanding here. We know that that was not the full scope of Mr. Cornell's record. We would—we certainly believe that wasn't the full scope of his benefits. He was getting the benefit of not being prosecuted for significant criminality that the state knew about, the state had evidence about, the state had already gone to a court that found probable cause that he committed other offenses, and that involved scores of gunpoint robberies. All right. Well, you've got three minutes for rebuttal, so we'll hear from you again. Mr. Clem, thank you. Thank you. We'll now hear from Ms. O'Shea. Good morning, Your Honors. May it please the Court, my name is Sheila O'Shea, and I represent the respondent on this appeal. As Judge Giardini pointed out, the standard on habeas review is whether the state court unreasonably applied clearly established federal law. Specifically with respect to the Brady claim, the question is whether the undisclosed evidence— I'm so sorry. Can you move your mic closer to me? Oh, I beg your pardon. Is that better? That'll help. With respect to the Brady claim, the question is whether the undisclosed evidence was so obviously material that no fair-minded jurist could have concluded that it was not material, and I submit that the petitioner has not met that high standard. First, as the district court found, there was no reasonable possibility that additional cross-examination on the suppressed evidence would have affected the verdict, and that is because even without Cornell's testimony that petitioner told Thomson to pop or shoot the victim, there was overwhelming evidence of petitioner's guilt. As the appellate division found by itself, the surveillance video depicting the petitioner's aggressive conduct toward the victim was enough to warrant the conclusion— So can you answer how that pertains to what your colleague on the other side is saying about the difference between showing physical harm versus serious physical harm? Sure. First of all, upon entering the bodega, the petitioner punches the victim, grabs him by his neck, and pushes him toward the back of this door. At that point, he turns around. He sees Thomson approaching with quite a large gun in his hand. He expresses no surprise at that point, says nothing about, you know, that wasn't part of the plan. No one talked about a gun. So I guess what I'm hearing you say is that you think the standard for serious physical harm has been met, not just physical harm. Oh, absolutely. Absolutely. By virtue of the fact that the gun was visible from the video. Yes, and he continued to pursue the victim and even essentially chased him directly into the crosshairs of the gun. So at a minimum, I think the standard for serious physical injury was met, if not the standard for second-degree murder. But, of course, the jury acquitted on that count. Well, I know, but, I mean, what you've just described, without the statement, is sufficient to establish the count that the jury returned a guilty verdict. Yes, absolutely. If the jury accredited the shoot-in, I mean, would there be any basis not to convict on a second-degree murder? I think not. It's hard to know why the jury did not convict, even absent the pop-in testimony. Perhaps the jury felt that because the petitioner wasn't actually the person who pulled the trigger, he was entitled to some leniency. I don't know. Or they didn't credit the testimony. Correct. The shoot-in testimony, because it was equivocal. He contradicted himself on the stand and had contradicted himself in the grand jury. Right. Which brings us to our next point, as your Honor has pointed out. The defense attorney impeached Cornell with his grand jury testimony. In the grand jury, Cornell said it was Barnhill who said pop-in. Barnhill was the third member of this group. And then the defense attorney also admitted, I'm sorry, elicited on cross-examination, that Cornell did not know who said those words because he was facing the back of the bodega and away from the petitioner. So at that point, I think his credibility was severely impeached. But how would they have known the extent of the criminality if y'all had the affirmative duty to produce it? And we don't dispute that we did, your Honor, and that it wasn't produced, and that I think it's fair to say that perhaps there was a lack of diligence on the part of the trial assistant in gathering the information about Cornell's prior criminal acts. But I think the most important evidence that went to Cornell's credibility was the fact that he said he sold fake drugs for a living. Basically, he's making his living by lying to people. A lot of the undisclosed evidence pertained to violent assaults, pistol-whipping, robbing other drug dealers, and, you know, just because you rob a drug dealer doesn't mean you're a liar. So I think that the most important evidence that went to his credibility was, in fact, before the jury. And as my adversary mentioned, you know, there were disclosures by the people prior to the trial with respect to the open gun case. Thompson's counsel had obtained and provided Petitioner's counsel with the indictment. The felony complained in the voluntary disclosure form for the case. Defense counsel knew that the police had recovered a loaded gun, two types of ammunition, a bulletproof vest, and marijuana from Cornell's apartment. And defense counsel also knew that Cornell had made a post-arrest statement in which he admitted that the gun and the vest belonged to him. He had had the gun for three years. He sold fake drugs. He needed the gun and the vest to problems on the street, and he had owned the second gun for a long time and had sold it. In addition, there was a stipulation whereby the people stipulated that Cornell had a pending gun case and the facts of that case. So I'm just struggling with, I mean, you're reciting a lot right now, but how do we square that with the fact that your summation, your direct examination, and your redirect largely focused on Cornell's statement that Jones was the one that said the pop? Well, that's not exactly accurate, Your Honor. In fact, if one looks at the people's summation, umpteen, and umpteen Joneses did the prosecutor to implore the juror to watch the video. If you watch the video, you'll see Thompson pull out the gun. If you watch the video, you'll see a petitioner walking like he's on a mission. He's the leader of the pack. If you watch the video, you can see the petitioner trying to grab the victim, trying to hold him still so Thompson can get a clear shot. Only after going through the character, the behavior exhibited on the videotape did the prosecutor say to top it all off, petitioner said pop him. Again, he returned to talk about the video later in his summation at page 1045. The prosecutor actually said if you don't believe the petitioner said pop him, Jones's actions alone, which are visible on the video, are enough to find him guilty. So I don't think it's fair to say that we relied exclusively or even necessarily heavily upon the pop him testimony. I think we also relied heavily upon the behavior exhibited on the surveillance video. And armed with the information that he did have, the defense attorney effectively attacked Cornell's credibility and motive to lie. For example, he asked him if he sold fake drugs for a living, if he carried a gun to protect himself from disgruntled customers. He elicited that Cornell was high on marijuana at the time of the shooting, and he also crossed him about his open gun case. And as I said, although yes, there was information that the people should have disclosed and did not, that information I think was less probative of Cornell's motive for lying than the evidence that was disclosed. As I said, he says he lies for a living. That's pretty damning. Would you, Your Honor, like me to address the confrontation point? Sure. Well, again, the question is whether no fair-minded jurist could agree that although Cornell declined to answer questions about the cooperation agreement, there was no prejudice to the petitioner because the stipulated agreement was before the jury. And again, the petitioner has failed to meet that high standard. As the district court found, the petitioner received a full opportunity to cross-examine Cornell about all matters related to the shooting. And as the district court also concluded, the jury possessed more than enough information to make a discriminating appraisal of Cornell's potential bias or motive to lie. Specifically, the jury knew that Cornell was facing 15 years in prison on the open gun case and that the people would make the extent of his cooperation known to the judge in that case should he face sentencing. And I think as perhaps Your Honor has alluded to earlier, and as the magistrate judge pointed out, the petitioner cites no case in which a petitioner's confrontation rights were violated where a witness refused to answer questions about a cooperation agreement but the cooperation agreement was stipulated to by the parties and disclosed to the jury. So I think the petitioner is hard-pressed to argue that there was a violation of clearly established federal law when there really is no clearly established federal law with respect to this issue. And if the court has no further questions, I'll rest on my brief. All right. Thank you, Ms. O'Shea. And Mr. Klem, we'll hear from you for three minutes of rebuttal. The evidence without Cornell's testimony is really just the video. There's no statements. There's no confession. There's no evidence that Mr. Jones knew that Thompson had a gun. The bodega clerk is there as well and sees the gun and can say that the gun was in plain view. The gun wasn't in plain view when they entered. Mr. Thompson had the gun somewhere obviously on him, pulls it out at some point, and it falls to the ground. The gun was clearly there that Thompson brought in, but there's no evidence whatsoever that Mr. Jones knew that Thompson had that gun. When he came in, you mean, or at any point during the exchange? Certainly when he came in, but it's not even clear if he knew at any point during the exchange. What Mr. Jones does when he comes into the bodega is entirely inconsistent with any intent to murder or cause serious physical injury, which New York defines as causing a substantial risk of death. There's no evidence of that. What he does is he comes in, he argues with Peguero, and then he punches him. That's a very strange action for a group that has gathered together to go kill or seriously physically injure Mr. Peguero. It's weird to punch somebody before you kill them? If what your intent is upon entering the bodega is to go and murder the person, this is a very strange thing to do, and the prosecution was left to argue below, which I think they've abandoned, that, well, Jones, his role was going to be to hold Mr. Peguero while Thompson shot him. They've seemingly abandoned that, but instead what we're looking to now are Mr. Jones' facial expressions on the surveillance video. Those are awfully thin reeds upon which to say that the evidence of Mr. Jones' intent is overwhelming. As to the final point regarding we don't have Supreme Court case on point, I think that's completely incorrect. The confrontation clause violation here stems from not permitting the question as to bias or motive, which Van Arsdale clearly speaks to. Then the only issue remaining is whether that is harmless or could be excused. That's a factual question, of course, that doesn't require separate Supreme Court precedent to determine whether there was another case which featured a stipulation, and for the reasons we spoke about earlier, the stipulation here was clearly insufficient and unreliable and shouldn't be used to find that the error in not permitting cross-examination was harmless. Thank you, Your Honor. All right, thank you, Mr. Clem. We will reserve decision. Thank you both.